# HARRIS, FORMERLY FRANCIS, ET AL. *v.* BELL ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 51. Argued January 26, 1920.—Decided November 15, 1920.

1. Lands representing the distributive share of a Creek Indian who died after his enrollment and before their selection or allotment and which thereafter were selected, allotted and deeded in his name, pursuant to the Act of April 26, 1906, c. 1876, § 5, 34 Stat. 137, and earlier statutes, are to be considered as going to his heirs, not as a direct allotment to them but as an inheritance, the alienability of which by full bloods is determined, not by § 19 of the Act of 1906 or § 1 of the Act of May 27, 1908, c. 199, 35 Stat. 312, respecting allotments to living allottees, but by the provisions governing alienability by heirs. P. 108.

2. In this regard it is not the usual distinctions between title by purchase and title by descent that must control, but the letter and spirit of the acts of Congress. *Id.*

3. The power vested in the Secretary of the Interior by the Act of April 26, 1906, *supra,* to approve or disapprove conveyances of inherited allotments when made by adult full-blood Indian heirs, was not recalled by the Act of May 27, 1908, *supra,* as to conveyances made, though not approved, before its enactment, nor does the lapse of 2½ years between the deed and its approval affect the validity of the conveyance in the absence of any lawful intervening disposal. P. 109.

4. The provision in § 9 of the Act of May 27, 1908, *supra,* that no conveyance of any interest of any full-blood Indian heir shall be valid "unless approved by the court having jurisdiction of the settlement of the estate" of the deceased allottee, prescribes a rule for future conveyances. P. 110.

5. Section 6 of the Act of May 27, 1908, *supra,* which subjects the persons and property of minor allottees to the jurisdiction of the probate courts of the State of Oklahoma, does not include or affect inherited lands, in its provision that "no restricted lands of living minors shall be sold or encumbered, except by leases authorized by law, by order of the court or otherwise." *Id.*

6. Section 6 of the Act of May 27, 1908, *supra*, and other acts of Congress, explicitly subject the persons and property of Indian minors of the Five Civilized Tribes to the jurisdiction of the probate (county) courts of Oklahoma; § 9 of that act declares that the death of any allottee shall remove all restrictions upon the alienation of his land, with the proviso that no conveyance of any interest of any full-blood Indian heir in such land shall be valid "unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee." · *Held*, harmonizing the sections, that the proviso of § 9 is to be taken as referring only to adult full-blood heirs, and that a probate court having jurisdiction over the persons and property of minor full-blood heirs, but not of the settlement of the estate of the deceased allottee from whom they inherited, was the proper court to sanction a conveyance of the allotment made by their guardian. P. 111.

7. The general rule giving to the court of guardianship exclusive power to direct the guardian and supervise the management and disposal of the ward's property, obtains in Oklahoma, and an intention to depart from it in an act of Congress respecting the lands of minor full-blood Indians should not be accepted unless very clearly and explicitly evinced. P. 112.

250 Fed. Rep. 209, affirmed.


THE case is stated in the opinion.


*Mr. James C. Davis* for appellants.


*The Solicitor General* and *Mr. Assistant Attorney General Nebeker* also filed a brief on behalf of appellants.


*Mr. William M. Matthews*, with whom *Mr. George S. Ramsey* was on the brief, for appellees.


· MR. JUSTICE VAN DEVANTER delivered the opinion of the court.


By this suit certain conveyances of lands allotted in the name and right of a Creek Indian after his death were assailed, and their cancellation sought, by the heirs who

made them.   On the final hearing the District Court upheld two of the conveyances, 235 Fed. Rep. 626, and that decree was affirmed by the Circuit Court of Appeals.   250 Fed. Rep. 209.   The present appeal is by the heirs.

The circumstances to be considered are as follows: By the Act of March 1, 1901, c. 676, 31 Stat. 861, as modified by the Act of June 30, 1902, c. 1323, 32 Stat. 500, provision was made for the allotment and distribution of the Creek tribal lands and funds among the members of the tribe.   An enrollment was to be made of (a) all members living on April 1, 1899, (b) all children born to members after that date up to and including July 1, 1900, and living on the latter date, and (c) all children born to members after July 1, 1900, up to and including May 25, 1901, and living on the latter date.   All who were so enrolled were to share in the allotment and distribution. If any of these died before receiving his allotment and distributive share, the lands and moneys to which he "would be entitled if living" were to "descend to his heirs" and be "allotted and distributed to them accordingly."   A provision in the Act of March 3, 1905, plainly intended to amend and supplement the earlier acts, authorized the inclusion of all children born between May 25, 1901, and March 4, 1905, and living on the latter date, c. 1479, 33 Stat. 1071.

Originally all lands allotted to living members in their own right were subjected to specified restrictions on alienation; but those allotted in the right of deceased members were left unrestricted up to the passage of the Act of April 26, 1906, c. 1876, 34 Stat. 137.   *Skelton* v. *Dill*, 235 U. S. 206; *Adkins* v. *Arnold*, 235 U. S. 417, 420; *Mullen* v. *United States*, 224 U. S. 448; *Brader* v. *James*, 246 U. S. 88, 94; *Talley* v. *Burgess*, 246 U. S. 104, 107. Section 19 of that act materially revised the restrictions respecting lands of living allottees, and § 22 dealt with the alienation of inherited lands, including, as this court has

held, lands allotted in the name and right of a member after his death. *Talley* v. *Burgess, supra*, p. 108. Section 22 read as follows:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a State or Territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

Section 5 of the same act directed that all patents or tribal deeds for allotments should issue "in the name of the allottee"—meaning the member in whose right the allotment was made—and provided that if he were then dead the title should inure to and vest in "his heirs," as if the patent or deed "had issued to the allottee during his life." A like provision is found in § 32 of the Act of June 25, 1910, c. 431, 36 Stat. 855.

Further provisions bearing on the alienation of lands of living allottees and also inherited lands were embodied in the Act of May 27, 1908, c. 199, 35 Stat. 312, to be noticed presently.

The lands in question were allotted in the name and right of Freeland Francis, a Creek child who was born in 1903, was lawfully enrolled June 10, 1905, and died twelve days later. After his death the allotment was

duly selected and made by the Commission to the Five Civilized Tribes, and in regular course a patent or deed was issued in his name. His heirs, to whom the title passed under the statutes already noticed, were his mother, Annie Francis (now Harris), his half-brother, Mack Francis, his brother, Amos, and his sister, Elizabeth. These were all enrolled Creeks,—three being full-blood Indians and one a half-blood.

January 15, 1908, after the allotment was perfected, the mother, who was an adult, sold and conveyed her interest, and that conveyance was approved by the Secretary of the Interior, July 6, 1910, the approval as endorsed on the deed reading:

"The conveyance by Annie Francis of her interest as full-blood Indian heir in and to the within described lands allotted to Freeland Francis, a new born Creek citizen, Roll No. 1070, who died prior to May 27, 1908, is hereby approved, in accordance with the provisions of the Act of Congress approved April 26, 1906."

The half-brother, Mack, sold and conveyed his interest in 1910, after he attained his majority, but the validity of that transaction is not questioned. He was not a full-blood Indian, but a half-blood.

January 15, 1912, the interest of Amos and Elizabeth, who were minors, was sold and conveyed by their guardian under the direction and approving order of the county court wherein the guardianship of their persons and property was pending.

At the time of Freeland's death the family was residing in that part of the Indian Territory which on the advent of statehood (November 16, 1907) became Wagoner County, and shortly after his death they removed to and ever since have resided in what became Okmulgee County. The lands are in the latter county and it was in the county court thereof that the guardian's sale and conveyance were directed and approved.

The conveyance by the mother, who was a full-blood Indian, and that by the guardian of Amos and Elizabeth, who were full-bloods, are the ones to be considered on this appeal. All rights under them are held by parties who were defendants in the District Court and are appellees here.

The grounds on which the conveyances are assailed are four in number,—one directed at both conveyances, one at that of the mother alone and two solely at that of the guardian. They will be taken up in this order.

1. It is urged that the heirs took the lands as allottees and not as heirs of Freeland,—in other words, that they received the lands as a direct allotment to them and not as an inheritance,—and therefore that such of them as were full-blood Indians were restrained and disabled from disposing of the lands by reason of the restrictions applicable to living allottees of the full-blood. If the premise were right, the conclusion would be unavoidable. See § 19, Act of 1906, *supra*, and § 1, Act of 1908, *supra*. But the premise is not right, as is shown by statutes already mentioned, such as § 28 of the Act of 1901, § 7 of the Act of 1902 and § 5 of the Act of 1906. The allotment was made in virtue of the right of Freeland, who was one of those among whom the tribal property was to be distributed. Under the statutes that right was not extinguished by his death but was preserved for his heirs; and it was preserved for them because they were his heirs, and not because their relation to it was otherwise different from that of other members of the tribe. Such individual claims as they had to the tribal lands were to be satisfied by their individual allotments. What they were to receive in the right of Freeland was the lands and moneys to which "he would be entitled if living"; and these were to "descend" to and vest in them as "his heirs," as if he had received the same "during his life." Putting aside the distinctions between title by purchase and title by descent

which prevail in the absence of controlling statutes, and giving effect to the letter and spirit of what Congress has enacted, we think it is manifest that these heirs must be regarded as having received these lands as an inheritance from Freeland, and not as a direct allotment to them. *Perryman* v. *Woodward*, 238 U. S. 148, 150; *Talley* v. *Burgess, supra.*

2. The first restrictions applicable to Creek lands such as these were embodied in § 22 of the Act of 1906, hereinbefore set forth. As respects the mother's conveyance, which was executed January 15, 1908, all that was necessary under that section to make the conveyance effective—the mother being an adult full-blood Indian—was that it be approved by the Secretary of the Interior. As before shown, it was approved by that officer July 6, 1910. But it is urged that before his approval was given all power to approve had been taken from him and lodged elsewhere by the Act of May 27, 1908. Evidently the Secretary did not so construe that act when his approval was given, else he would have withheld it. Not only so, but his action in this instance was in accord with the practice of his office for a considerable period and also with an opinion rendered to him by the Attorney General. 27 Ops. A. G. 530. This administrative view is, of course, entitled to respect, and those who have relied thereon ought not lightly to be put in peril. But it is not controlling. We have examined the act, including § 9, upon which reliance is had, and are of opinion that as to conveyances made prior to the act the power of the Secretary to examine and approve or disapprove under § 22 of the prior enactment was not taken away. The act contains no express revocation of that power, nor any provision inconsistent with its continued exercise as to prior conveyances. The provision in § 9, that no conveyance of any interest of any full-blood Indian heir shall be valid "unless approved by the court having jurisdiction of the settlement of the

estate" of the deceased allottee, taken according to its natural import, prescribes a rule for future rather than prior conveyances; and no reason is perceived for rejecting its natural import. Had there been a purpose to cut off action by the Secretary as to conveyances already made, some of which were before him at the time, it is but reasonable to believe that other words aptly expressing that purpose would have been used. The matter hardly would have been left to conjecture or uncertain implication. Besides, the absence of such a purpose is measurably reflected by the declaration in § 1 that "the Secretary of the Interior shall not be prohibited by this Act from continuing to remove restrictions as heretofore." The lapse of two and one-half years between the execution of the conveyance and its approval is not material, there being no lawful intervening disposal. *Pickering* v. *Lomax,* 145 U. S. 310; *Lykins* v. *McGrath,* 184 U. S. 169.

3. Section 6 of the Act of 1908 subjects the persons and property of minor allottees to the jurisdiction of the probate courts of the State, and in a proviso says, "no restricted lands of living minors shall be sold or encumbered, except by leases authorized by law, by order of the court or otherwise." One ground on which the guardian's sale on behalf of the minor heirs, Amos and Elizabeth, is assailed is that it was in violation of this proviso. But in our opinion the proviso does not include or affect inherited lands. It refers, as a survey of the act shows, to lands of living minor allottees and not to lands inherited from deceased allottees. Section 9 expressly recognizes that the latter may be sold, and this proviso cannot be taken as prescribing the contrary. The word "living" evidently is intended to mark the distinction. What is intended is to make sure that minor allottees receive the benefit of the restrictions prescribed in § 1, and not to impose others. Apparently it was apprehended that the general language of § 6 might be taken as enabling probate

courts and guardians to sell without regard to those restrictions, and the office of the proviso is to prevent this. So understood, it is in accord with the general scheme of the act and not in conflict with any other provision.

4. The remaining objection to the guardian's conveyance is that it was not approved by the court having jurisdiction of the settlement of the estate of Freeland, the deceased allottee.

The situation out of which the objection arises is at least novel. Freeland died June 22, 1905, and the conveyance was made January 15, 1912. Statehood had intervened and counties had been organized where there were none before. He resided and died in what afterwards became Wagoner County, and under the local law the county court of that county is the one which at the time of the conveyance would have had jurisdiction of the settlement of his estate. The court in the Indian Territory which would have had such jurisdiction prior to statehood was no longer in existence. The conveyance was not approved by the county court of Wagoner County, but was approved by the county court of Okmulgee County, which under the local law was the only court having jurisdiction of the guardianship of the persons and property of the minors, Amos and Elizabeth. The lands were in that county and the minors, as also the other heirs, were residing there.

Section 6 of the Act of 1908 and other congressional enactments explicitly subject the persons and property of Indian minors of the Five Civilized Tribes to the jurisdiction of the probate courts of Oklahoma. In that State the county courts are the probate courts.

Section 9 of the same act declares:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: *Provided*, That no conveyance of any interest of any full-blood Indian heir in

such land shall be valid unless approved by the court hav-
ing jurisdiction of the settlement of the estate of said
deceased allottee."

If in this instance the same court had had jurisdiction
of the guardianship of the minor heirs and of the settle-
ment of the estate of the deceased allottee, no embarrass-
ment would have ensued; but as that was not the case, the
question arises, whether it was essential that the guardian's
conveyance, directed and approved, as it was, by the
court having control of the guardianship, should also be
approved by the court having jurisdiction of the settle-
ment of the deceased allottee's estate? The Circuit
Court of Appeals answered in the negative; and, while
the question is not free from difficulty, we think that
solution of it is right.

Of course, the purpose in requiring any approval is to
safeguard the interests of the full-blood Indian heir.
Where he is a minor he can convey only through a guard-
ian, and no court is in a better situation to appreciate and
safeguard his interests than the one wherein the guardian-
ship is pending. Besides, as a general rule, a guardianship
carries with it exclusive power to direct the guardian and
to supervise the management and disposal of the ward's
property. It is so in Oklahoma. This rule is so widely
recognized and so well grounded in reason that a purpose to
depart from it ought not to be assumed unless manifested
by some very clear or explicit provision. The Act of
1908 contains no manifestation of such a purpose outside
the proviso in § 9. That proviso seems broad, but so is
the provision in § 6 subjecting the persons and property
of minor Indians to local guardianship. As both are in
the same act, they evidently were intended to operate
harmoniously and should be construed accordingly. The
proviso does not mention minors under guardianship;
and to regard its general words as including them will
either take all supervision of the sale of their interest in

inherited lands from the court in which the guardianship is pending, or subject that court's action to the approval of another court of the same rank.   In either event conflict and confusion will almost certainly ensue and be detrimental to the minor heirs.   But, if the proviso be regarded, as well it may, as referring to heirs not under guardianship—in other words, to adult heirs—the two provisions will operate in entire harmony and all full-blood heirs will receive the measure of protection intended. We think this is the true construction.

*Decree affirmed.*