## WHITE et al. v. SINCLAIR PRAIRIE OIL CO. et al.

### No. 2698.

Circuit Court of Appeals, Tenth Circuit.

Nov. 16, 1943.

Rehearing Denied Jan. 3, 1944.

Hiram P. White, of Pawhuska, Okl. (Charles A. Coakley and G. Ellis Gable, both of Tulsa, Okl., on the brief), for appellants.

Summers Hardy and Paul B. Mason, both of Tulsa, Okl. (Edward H. Chandler and W. H. McBrayer, both of Tulsa, Okl., McCoy, Craig & Pearson, of Pawhuska, Okl., and H. G. Ross, of Tulsa, Okl., on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

John A. Bruno and Mary Vieux were married on February 26, 1892. They were members of the Citizen Band of Pottawatomie Indians. On September 16, 1891, 320 acres of land situated in Pottawatomie County, Oklahoma, were allotted to John and a trust patent therefor was issued to him on January 19, 1892. Included therein was the south half of the northwest quarter of Section 25, Township 7 North, Range 4 East of I. M. A trust patent was also issued to Mary covering an allotment to her of 120 acres of land. Each patent contained a provision that the United States would hold the land in trust for a period of 25 years, in accordance with the requirements of the General Allotment Act of February 8, 1887, 24 Stat. 388, § 5, 25 U.S.C.A. § 348.

The Act of August 15, 1894, 28 Stat. 286, 295, provided that a member of the Pottawatomie Band, over 21 years of age, to whom a trust patent had been issued under the provisions of the General Allotment Act, might sell and convey any portion of the land embraced in such patent in excess of 80 acres, with the approval of the Secretary of the Interior, under such rules and regulations as the Secretary might prescribe.

On March 19, 1903, John executed a deed running to Mary covering the south half of the northwest quarter of Section 25. The deed was approved by the Acting Secretary of the Interior on November 21, 1903, and was duly recorded in the records of Pottawatomie County on March 2, 1904.

On July 23, 1903, the Acting Secretary canceled the original patent issued to John. On June 22, 1904, new trust patents were issued, one to John for the north half, and one to Mary for the south half, of the northwest quarter of Section 25.

On February 5, 1904, and March 14, 1904, respectively, the Brunos executed two mortgages to George G. Boggs, covering the south half of the northwest quarter of Section 25. On February 12, 1910, and June 4, 1910, judgments were entered in the superior court of Pottawatomie County decreeing the foreclosure of such mortgages. The land covered by the mortgages was sold at foreclosure sale and sheriff's deeds therefor were issued to M. C. Getzelman. Thereafter, M. C. Getzelman conveyed it to B. C. Getzelman.

On June 8, 1925, W. H. Desmond, as lessor, executed and delivered to the Prairie Oil and Gas Company,[1] as lessee, an oil and gas lease on the southeast quarter of the northwest quarter of Section 25. The lease reserved a one-eighth royalty in the lessor. Prairie thereafter assigned the lease to Sinclair Prairie Oil Company.[2] The name of Prairie was changed to The Commonwealth Oil & Gas Company.

On July 22, 1926, B. C. Getzelman and Jennie Getzelman, his wife, C. E. Wells and Minnie F. Wells, his wife, and M. W. Janes, as lessors, executed and delivered to Omer McKown, as lessee, an oil and gas lease on the southwest quarter of the northwest quarter of Section 25. It reserved a one-eighth royalty in the lessors. McKown assigned the lease to Mid-Kansas Oil and Gas Company.[3] On August 25, 1934, Mid-Kansas changed its name to Marathon Oil Company, and on October 6, 1936, Marathon was dissolved and its interest in the lease was assigned to Ohio Oil Company.[4]

Each lease contained the following provision:

"If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided shall be paid the lessor only in the proportion which his interest bears to the whole undivided fee."

Wells were drilled on the leases in 1928 and large quantities of oil have been produced therefrom by Sinclair and Ohio and their predecessors in interest.

On September 22, 1928, the Brunos, Mid-Kansas, and Prairie entered into a compromise agreement. The agreement recites that Mary claims title to the south half of the northwest quarter of Section 25, and that such claim is denied by Prairie and Mid-Kansas, and that Prairie and Mid-

---

[1] Hereinafter called Prairie.
[2] Hereinafter called Sinclair.
[3] Hereinafter called Mid-Kansas.
[4] Hereinafter called Ohio.

Kansas are willing, in order to avoid litigation, to settle and compromise such claim, in so far as "it involves or affects the validity" of such oil and gas leases. It provides that in consideration of $8,000.-00, to be paid by Prairie and Mid-Kansas to Mary, "it is agreed that said Mary Bruno, joined by her husband, John A. Bruno, and by their attorney, Claude Hendon, does hereby ratify, adopt and approve said oil and gas leases so held by said Companies as fully as though she and they had originally executed such leases at the date of the execution thereof and for the consideration paid therefor; so that they or either of them will have no further claim of any kind or character, except as to royalty to be paid under said leases, as against said Companies, or either of them, after the execution hereof." It provides that such additional conveyances and acquittances shall be executed as may be necessary to render the agreement fully effective, including the approval of the Secretary of the Interior.

On March 14, 1930, the Brunos executed a further instrument which recites that the Brunos, Mid-Kansas, and Ohio entered into the agreement of September 22, 1928, whereby the Brunos "agreed to ratify, adopt and approve a certain oil and gas lease, which was claimed to have been held by the said Mid-Kansas Oil and Gas Company and Prairie Oil and Gas Company, the same as though she [Mary] and they had originally executed said lease at the time of the execution thereof and for the consideration paid therefor so that they or either of them would never have further claim to said lease of any kind or character except as to royalty to be paid under said lease."

It provides that the Brunos for and in consideration of $8,000.00 cash in hand paid do "hereby ratify, adopt, and approve" the Desmond lease of June 8, 1925, to Prairie, "said Prairie Oil and Gas Company to have and to hold said lease, free and clear of any claims or demands of the said Mary Bruno and John A. Bruno, their heirs or assigns the same and as fully as though they or either of them had originally executed said lease at the time of the execution thereof and for the consideration paid therefor so that they or either of them will have no further claim of any kind or character as against the Prairie Oil and Gas Company except as to royalty to be paid under said lease which royalties

amount to one-eighth (⅛) of the oil produced from said lease the said John A. Bruno and Mary Bruno expressly reserves unto themselves, their heirs and assigns." By a like provision in such instrument the Brunos ratified, adopted, and approved the Getzelman lease of July 22, 1926, as between the Brunos and Mid-Kansas. Such instrument was not executed either by Prairie or Mid-Kansas.

The instrument of March 14, 1930, was approved by the Secretary of the Interior on May 2, 1930.

The Brunos commenced an action in the District Court of Pottawatomie County, Oklahoma, against M. C. Getzelman and B. C. Getzelman to recover the possession of the south half of the northwest quarter of such Section 25, to cancel the two decrees in foreclosure, and to quiet the title to such land in them. From an adverse judgment, they appealed to the Supreme Court of Oklahoma. On appeal (Bruno v. Getzelman, 70 Okl. 143, 173 P. 850, decided June 11, 1918) the Supreme Court held that the deed to the south half of the northwest quarter of Section 25, when approved by the Secretary of the Interior, vested the land in Mary, free from restrictions against alienation, that she had full power to execute the mortgages, and that the trust patent issued to Mary in 1894 did not reimpose restrictions, and affirmed the judgment below.

On November 2, 1933, the United States commenced an action in the District Court of the United States for the Western District of Oklahoma against B. C. Getzelman, Desmond, Mid-Kansas, Sinclair, Prairie, and others to establish Mary's title to the south half of the northwest quarter of Section 25, to obtain an accounting of the royalties under such leases, which had been impounded by Prairie and Mid-Kansas, and to obtain a decree adjudging her to be entitled to the impounded royalties and future royalties to accrue under such leases. From an adverse judgment, the United States appealed to this court. See United States v. Getzelman, 10 Cir., 89 F.2d 531, cert. den. 302 U.S. 708, 58 S.Ct. 27, 82 L.Ed. 547. In that case, we held that the deed from John to Mary upon the approval thereof by the Acting Secretary of the Interior on November 21, 1903, vested title in Mary to the south half of the northwest quarter of Section 25 as of March 19, 1903, free and clear of all restrictions against alienation; that the

mortgages were executed and delivered to George G. Boggs for a valuable consideration prior to the issuance of the trust patent on June 22, 1904; that the mortgages were duly foreclosed; and that the defendants acquired title through the purchaser at the foreclosure sale.

Mary died April 28, 1939. Thereafter, White, as administrator of her estate, and the heirs-at-law of Mary brought this action against Sinclair, Prairie, Mid-Kansas, and Ohio to recover the value of one-eighth of all the oil produced from the leased premises. The administrator and heirs have appealed from an adverse judgment.

The action is predicated upon the provisions of the agreement of September 22, 1928, and the instrument of March 14, 1930.

 Counsel for the administrator and the heirs contend that, notwithstanding title to the land vested in Mary, free of restrictions, and passed to M. C. Getzelman by the sheriff's deeds in the foreclosure proceeding, and to his successors in title, and that Sinclair and Ohio are obligated to pay the present owners of the land a one-eighth royalty under the leases, they are also entitled by virtue of the agreement of September 22, 1928, and the instrument of March 14, 1930, to receive a one-eighth royalty under the leases. By such agreement and instrument the Brunos ratified, adopted, and approved the respective leases as if they had been parties to and had executed such leases at the time they were executed by the respective lessors named therein. It placed them in the position of original lessors under the leases. Such ratification embraced the leases in their entirety, including the provision that if the lessor owns less than an entire undivided fee simple estate he shall receive royalty only in the proportion which his interest bears to the entire fee. Under such a provision, where the lessor has no title to the minerals, he is not entitled to any royalty under the lease.[5] Such agreement and instrument expressly limited the claims of the Brunos as against Prairie and Mid-Kansas to "royalty to be paid under said leases." The only royalty which was to be paid under the respective leases was a single one-eighth which was to be paid to the owners of the leased land in proportion to their respective interests therein.

The Brunos, having failed to establish any claim of title to the leased premises, are not entitled to any royalty. Had the parties intended otherwise, it is reasonable to suppose that they would have expressly provided that the Brunos should receive an additional overriding one-eighth royalty out of the seven-eighths working interest. On the contrary, the agreement of September 22, 1928, expressly states "royalties to be paid under said leases" and the instrument of March 14, 1930, expressly recites "royalty to be paid under said lease."

Moreover, the title to the land was in dispute. The Brunos asserted title as against the named lessors. The purpose of the compromise was to settle the controversy as between the Brunos and Prairie and Mid-Kansas, and to render the leases valid, irrespective of which of the claimants ultimately established their claims of title. If the Brunos were successful in establishing their claim of title, they were to receive the entire royalty. If they failed, by the terms of the leases which they ratified, they were to receive no royalty because they expressly limited their rights as against Prairie and Mid-Kansas to royalties to be paid under the leases.

 The action which the United States commenced on November 2, 1933, in the District Court of the United States for the Western District of Oklahoma was brought in behalf of Mary. Mid-Kansas, Sinclair, and Prairie were parties defendants thereto. In its complaint the United States set up the leases herein involved, alleged that the royalties thereunder had been impounded by Mid-Kansas and Prairie, and that Mary was entitled to the impounded royalties and to future royalties accruing from the oil and gas produced under such leases. In such action the United States sought to establish Mary's title to the south half of the northwest quarter of Section 25 and to obtain an accounting of the royalties under such leases. The decree in that case dismissed the action on the merits with prejudice. That decree was binding upon Mary under the doctrine of res judicata.[6] In the instant action, Mary seeks to obtain an accounting of the royalties under the leases. She is

[5] Koval v. Carnahan, D.C.Ill., 45 F. Supp. 357, 358; Hooks v. Rocket Oil Co., 191 Okl. 431, 130 P.2d 846.

[6] Vinson v. Graham, 10 Cir., 44 F.2d 772, cert. den. 283 U.S. 819, 51 S.Ct. 344, 75 L.Ed. 1435.

barred from so doing by the decree in the action brought by the United States in her behalf. True, in the instant case, she sets up a new ground upon which she predicates her right to the royalties. This she may not do. A party seeking to enforce a cause of action must present to the court, either by pleading or proof, or both, all the grounds upon which such cause of action is predicated. He is not at liberty to split up his demand and prosecute it by piecemeal or to present a part of the grounds upon which such cause of action is founded and leave the rest to be presented in a subsequent suit if the first fails.[7]

We conclude that the judgment below was right and it is, therefore, affirmed.

---

[7] Vinson v. Graham, 10 Cir., 44 F.2d 772, 778, cert. den. 283 U.S. 819, 51 S.Ct. 344, 75 L.Ed. 1435; Baltimore S. S. Co. v. Phillips, 274 U.S. 316, 321, 47 S.Ct. 600, 71 L.Ed. 1069; United States v. California & Ore. Land Co., 192 U.S. 355, 24 S. Ct. 266, 48 L.Ed. 476; Calaf v. Calaf, 232 U.S. 371, 34 S.Ct. 411, 58 L.Ed. 642; Werlein v. New Orleans, 177 U.S. 390, 20 S.Ct. 682, 44 L.Ed. 817; McGrew v. McGrew, 59 App.D.C. 230, 38 F.2d 541;

Conn v. Ringer, 6 Cir., 32 F.2d 639; Sapulpa Pet. Co. v. McCray, 8 Cir., 4 F.2d 645, 650; Hickey v. Johnson, 8 Cir., 9 F.2d 498; Staley v. Espenlaub, D.C.Kan., 36 F.2d 91, 93; Id., 10 Cir., 43 F.2d 98; Ledbetter v. Wesley, 8 Cir., 23 F.2d 81, 86, 88; Shinkle v. Vickery, C.C.Ind., 117 F. 916; Little v. Smith, 47 Cal.App. 8, 189 P. 1059; State v. Cheney, 67 Wash. 151, 121 P. 48, 50.